PRECISION MECHANICAL SERVICES, INC. *v.*
SHELTON YACHT AND CABANA CLUB, INC.
(AC 26800)

Schaller, Gruendel and Hennessy, Js.

Argued April 18—officially released August 29, 2006

*Benson A. Snaider*, for the appellant (defendant).

*Neal L. Moskow*, with whom, on the brief, was *Deborah M. Garskof*, for the appellee (plaintiff).

*Opinion*

HENNESSY, J. In this action to foreclose a mechanic's lien, the defendant, the Shelton Yacht and Cabana Club, Inc., doing business as Pinecrest Country Club (Pinecrest), appeals from the judgment of the trial court rendered in favor of the plaintiff, Precision Mechanical Services, Inc. (Precision). Pinecrest claims that the court improperly (1) found that it breached the contract it entered into with Precision, (2) awarded Precision $47,806 for breach of contract and (3) prohibited Pinecrest from calling an expert witness it did not disclose until after the trial had started. We affirm the judgment of the trial court.

The following procedural history and facts found by the court are relevant to our consideration of the issues in Pinecrest's appeal. Precision is a corporation that designs, fabricates and installs sprinklers. Its president, Kevin M. Wypychoski, is a licensed fire protection contractor and plumber in Connecticut. Pinecrest is a corporation operating a catering and function hall at 745 River Road in Shelton. Jonathan Zuckerman, its president, has operated Pinecrest for more than thirty years.

In 2002, Pinecrest was warned by the town fire marshal that it was not in conformity with the applicable fire codes and that it needed to install a sprinkler system in order to continue operating. As a result, Pinecrest, through Zuckerman, contacted Precision about fabricating and installing a sprinkler system. Shortly thereafter, Wypychoski met with Zuckerman at Pinecrest to discuss sprinkler systems and associated costs. During the meeting, Zuckerman told Wypychoski that Pinecrest's multiroom building was approximately 10,000 square feet. Wypychoski told Zuckerman that it would cost $5 per square foot to fabricate and install the sprinkler system and, thus, the sprinkler system would cost approximately $50,000. Wypychoski drafted a budget proposal outlining what he orally told Zuckerman.

After meeting with Wypychoski, Zuckerman spent the next six months looking for a way to keep Pinecrest in operation without installing a sprinkler system. Zuckerman's attempt to find an alternative method to continue operating ultimately proved futile, and he therefore contacted Precision and another sprinkler company, Connecticut Fire Protection & Sprinkler Service Company, Inc. Precision sent a second budget proposal, dated March 4, 2003, which restated that it would cost $50,000 to fabricate and install a sprinkler system. Connecticut Fire Protection & Sprinkler Service Company, Inc., sent a proposal stating that it would fabricate

and install a sprinkler system for $89,500. Pinecrest hired Precision because it was the lower bidder.

Precision drafted a contract on the basis of the second proposal. Article one of the contract states that Precision "shall . . . [d]esign and install a fire sprinkler system throughout the entire building (approximately 10,000 square feet)." Zuckerman added a clause to the contract requiring that all work result in compliance with the applicable fire codes. Zuckerman then signed the contract.

Between March 18 and April 10, 2003, Precision's employees took detailed measurements of the building. The measurements indicated that the building was actually 20,800 square feet. As a result, Wypychoski notified Zuckerman of the discovery and that the contract would have to be amended to reflect the increased cost due to the additional square footage. Wypychoski further told Zuckerman that he would be issuing a change order reflecting the new price.

Subsequently, on April 24, 2003, Precision started sending material and equipment that would later be used for the fabrication and installation of the sprinkler system. On April 30, 2003, Precision issued a change order, which reflected an additional cost of $46,800 for the additional square footage. On May 2, 2003, Pinecrest's counsel sent a letter to Wypychoski, arguing that Precision was bound by the $50,000 price of the contract and that Pinecrest would not pay the price reflected in the change order. Despite the letter, Zuckerman and Wypychoski continued to negotiate the final price. During these negotiations, Zuckerman instructed Wypychoski to proceed with the work. Precision continued to fabricate and install the sprinkler system. Zuckerman, however, made no additional payments for work done after May 2, 2003.

On June 2, 2003, Precision, with the sprinkler system not fully completed, stopped working because it was not receiving any of the prearranged scheduled payments. On July 10, 2003, Precision removed all of its materials and equipment from the job site. Precision then billed Pinecrest for the completed work, which Precision argued was 100 percent of the original contract work and $12,600 on the change order, totaling $66,356, of which Pinecrest paid $18,550. As a result, Precision executed, served and recorded a mechanic's lien to secure payment of the balance.

On September 29, 2003, Precision commenced this action to foreclose its mechanic's lien on theories of breach of contract and unjust enrichment. In response, Pinecrest asserted the special defenses of failure to perform work at an agreed on price, payment in full, estoppel and negligent installation. In addition, Pinecrest filed a counterclaim seeking damages for incomplete performance of the contact, loss of income from the inability to use the premises and improper installation requiring removal and replacement of the sprinkler system.[1]

The matter was tried to the court on July 6 and September 7, 8, 9, 13 and 28, 2004. On August 10, 2004, during the recess between the first and second day of trial, Pinecrest attempted to disclose a third expert witness, Roger H. Brake, Jr. Precision objected to the disclosure, arguing that it was untimely and prejudicial. The court sustained the objection. The court ultimately rendered judgment in favor of Precision. This appeal followed. Additional facts will be set forth as necessary.

I

Pinecrest first claims that the court improperly found that it breached the contract it entered into with Precision. Pinecrest specifically argues that the original written contract was never modified and, thus, both parties

---

[1] Pinecrest also sought damages under the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq.

were bound by its terms. Before we address the merits of Pinecrest's claim, we set forth the applicable standard of review and legal principles relating to contract modification.

"For a valid modification to exist, there must be mutual assent to the meaning and conditions of the modification and the parties must assent to the same thing in the same sense." (Internal quotation marks omitted.) *Herbert S. Newman & Partners, P.C.* v. *CFC Construction Ltd. Partnership*, 236 Conn. 750, 761, 674 A.2d 1313 (1996). "The manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by failure to act." (Internal quotation marks omitted.) *Ubysz* v. *DiPietro*, 185 Conn. 47, 51, 440 A.2d 830 (1981). Moreover, "[m]odification of a contract may be inferred from the attendant circumstances and conduct of the parties. . . . Whether the parties to a contract intended to modify the contract is a question of fact. . . . The resolution of conflicting factual claims falls within the province of the trial court. . . . The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witness." (Internal quotation marks omitted.) *Herbert S. Newman & Partners, P.C.* v. *CFC Construction Ltd. Partnership*, supra, 761.

The court found that although Zuckerman originally rejected the change order and never signed it, his subsequent actions manifested his intent to modify the original contract according to the terms of the change order. Upon review of the entire record, we can find no reason to disturb the court's finding. The change order increased the original contract price by $46,800. The record indicates that after Zuckerman rejected the change order, he directed Wypychoski to continue working. At this time, he knew that the building was approximately 10,000 square feet larger than Precision

had originally believed and that the work would cost approximately $5 a square foot. The record also indicates that Pinecrest was required, by law, to install a sprinkler system in the entire building in order to continue operating. Therefore, the court's finding that Pinecrest, through Zuckerman's conduct, accepted the terms of the change order is supported adequately by the record and is not clearly erroneous.

## II

Pinecrest next claims that the court improperly awarded Precision $47,806 in contract damages. It appears from its brief that Pinecrest's second claim is twofold. In the first half of its claim, Pinecrest does not challenge the court's interpretation of contract terms, nor does it challenge the court's calculation. Instead, Pinecrest acknowledges that the $47,806 awarded "assumed . . . the contract . . . had been billed based upon the 'change order' . . . ." It argues that the award was improper because Precision "sued upon the original contract not the 'change order.' " Pinecrest, however, did not raise this argument before the trial court, and, pursuant to our rules of practice, we are not bound to address claims raised for the first time on appeal. Practice Book § 60-5; see also *Solomon* v. *Connecticut Medical Examining Board*, 85 Conn. App. 854, 862, 859 A.2d 932 (2004), cert. denied, 273 Conn. 906, 868 A.2d 748 (2005).

In the last part of its claim, Pinecrest appears to argue that the award was improper because it never accepted the terms of the change order and, thus, both parties were bound by the terms of the original written contract. This argument is identical to Pinecrest's first claim. Accordingly, we reach the same result.

## III

Pinecrest last claims that the court improperly prohibited it from calling Brake as an expert witness. "It is a well established principle of law that the trial court may exercise its discretion with regard to evidentiary

rulings, and the trial court's rulings will not be disturbed on appellate review absent abuse of that discretion. . . . Sound discretion, by definition, means a discretion that is not exercised arbitrarily or wilfully, but with regard to what is right and equitable under the circumstances and the law . . . . In our review of these discretionary determinations, we make every reasonable presumption in favor of upholding the trial court's ruling." (Internal quotation marks omitted.) *Opotzner* v. *Bass*, 63 Conn. App. 555, 568, 777 A.2d 718, cert. denied, 257 Conn. 910, 782 A.2d 134 (2001), cert. denied, 259 Conn. 930, 793 A.2d 1086 (2002).

Practice Book § 13-4 (4) provides in relevant part that "[e]ach defendant shall disclose the names of his or her experts . . . within a reasonable time from the date the plaintiff discloses experts, or, if the plaintiff fails to disclose experts, within a reasonable time prior to trial. If disclosure of the name of any expert expected to testify at trial is not made in accordance with this subdivision, or if an expert witness who is expected to testify is retained or specially employed after a reasonable time prior to trial, such expert shall not testify if, upon motion to preclude such testimony, the judicial authority determines that the late disclosure (A) will cause undue prejudice to the moving party; or (B) will cause undue interference with the orderly progress of trial in the case; or (C) involved bad faith delay of disclosure by the disclosing party. . . ."

Brake, who would have been Pinecrest's third expert witness, was not disclosed until almost one month after the trial had started and only after Precision had presented a majority of its case-in-chief. Under the facts and circumstances of this case, we therefore conclude that the court did not abuse its discretion in prohibiting Brake from testifying.

The judgment is affirmed.

In this opinion the other judges concurred.